UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JARED ALGER,

             Plaintiff,

   v.

JIM MACDONALD,

             Defendant.

Case No. 15-cv-04568-WHO

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Re: Dkt. No. 19

## INTRODUCTION

Petitioner Jared Alger, currently in the custody of La Palma Correctional Center, seeks federal habeas relief from a state court manslaughter conviction on the grounds that his constitutional rights under the Sixth Amendment were violated when the trial court: (1) allowed an autopsy report into evidence, despite the report's author being unavailable for cross-examination; and (2) denied his request to substitute the public defender with privately retained counsel. Neither of these claims has merit. For the reasons set forth below, the petition for habeas relief is DENIED.

## BACKGROUND

The California Court of Appeal summarized the facts of the case as follows:

In August 2006, Louis Aguilar was living at 55 Bixler Road with his girlfriend, Heather Scott, and a friend, Doug Coyle; his nine-year-old son, Blake, was with him every other weekend. On the night of August 26, Aguilar invited some friends to the house, including appellant and Steve Goodmanson. Goodmanson brought his sister, Andrea, and his girlfriend, Anna Cattoor. Cattoor and Goodmanson had been friends for many years and romantically involved for about three years, exclusively for about three months. Cattoor testified that she had been romantically involved with appellant before she became involved with Goodmanson, but she did not think Goodmanson knew this, then acknowledged having told sheriff's officers that Goodmanson initially "had a problem" with her having been involved with appellant. She testified that appellant still had feelings for her after she started seeing Goodmanson, but she told him she did not return them. According to Cattoor, there was "a little bit" of friction between the two men over her, but "it

wasn't much friction." Aguilar testified that appellant continued to have feelings for Cattoor but he never got the feeling appellant was jealous of Goodmanson, nor did he observe friction between appellant and Goodmanson that went beyond what he would expect in a friendship between guys. On August 26, Cattoor, Goodmanson and appellant appeared to Aguilar to be under the influence of drugs; Aguilar did not see them consume drugs at his house but on the telephone Goodmanson had mentioned using drugs earlier in the afternoon. Cattoor testified that she and Goodmanson had consumed beers and some cocaine at a friend's house before going to Aguilar's.

Aguilar testified that shortly after Goodmanson arrived at the house, he went across the street with Blake to see the frogs in the pond. Blake had a .22 rifle and Goodmanson had a pellet gun. They went to the pond a second time with Cattoor and appellant. Then, with Aguilar joining them, the group went out in Goodmanson's truck to "shoot at frogs and whatnot." They took the two guns Blake and Goodmanson had previously taken, as well as a .22 rifle belonging to appellant that had been left at Aguilar's house. They stopped along the levee road and appellant, Goodmanson and Blake walked off looking for a rabbit the group had seen, while Aguilar and Cattoor stayed at the truck. Appellant had his .22 rifle; the other remained in the truck. After five or ten minutes, Blake came back to the truck. Cattoor had walked off toward appellant and Goodmanson meanwhile, then returned 10 or 20 minutes later. Blake told Aguilar that appellant and Goodmanson had been arguing a little bit. Aguilar had initially heard shots fired "in the rabbit area," then heard some more gunshots.

About 15 minutes after the last set of shots, Aguilar heard a single gun shot and a minute later saw appellant running toward the truck carrying a gun. Appellant said, "it went down" or "it's going down." Aguilar took this to mean appellant and Goodmanson had gotten into a fight. He had not heard anything that sounded like a fight, only loud, boisterous voices that were not unusual with appellant and Goodmanson. Aguilar asked where Goodmanson was and appellant said "he went fishing." Aguilar understood this to mean there had been a fight "and there was only one winner." Appellant was pacing around and seemed agitated, surprised, and scared. Appellant started to grab the rifle he had put down on the bed of the truck and Aguilar told him to leave the rifle if he and Goodmanson were fighting. Appellant left the gun and ran back down the road. When appellant reached a distance of about 150 yards, Aguilar could no longer see him in the darkness but heard what sounded like something rolling off the levee into the water. Aguilar felt, based on his hunting experience, that his ability to estimate distance was fairly accurate.

Appellant returned to the truck with a pair of boots. This led Aguilar to think Goodmanson was "no longer awake." In the area where Aguilar and appellant grew up, if one person took another's boots, it meant the first person had beaten the other in a fight. Aguilar did not think Goodmanson would lose a fight to appellant, who was smaller, and therefore thought whatever had happened was "farther than just a fistfight." Concerned for his and his son's safety, Aguilar walked away with Blake, taking his rifle. Cattoor remained with the truck.

Aguilar heard Cattoor scream and saw the truck move in reverse down the levee road. Then, as he and Blake walked home through a field, Aguilar saw the truck drive forward and make a right turn on Bixler. The truck slowed down briefly as it passed Aguilar's house and continued north on Bixler. At the house, Aguilar found Scott and Goodmanson's sister tending to Cattoor, who was lying on the floor bleeding. Scott had the sheriff's department on the phone and handed the phone to Aguilar, who said there had been a fight and he thought someone had been shot.

2

Aguilar then saw the truck pull into his driveway. Telling the others to stay in the house, he loaded his deer rifle, barricaded the doors with chairs and stepped to the back of the house. Appellant got out of the truck and Aguilar yelled to him; appellant did not have anything in his hands and Aguilar did not feel alarmed, so he put down his rifle. Appellant was doing pull ups from a tree branch. Aguilar tried to find out what had happened. Appellant asked what he should do, said he was going to go to Steve's, and told Aguilar to tell the truth, then got in the truck and drove back toward the levee road. Appellant did not, at the house or earlier at the levee, say he had accidentally shot Goodmanson.

Cattoor testified that at the levee, while the others were out looking for frogs, she got back into the cab of the truck, turned on the radio and dozed on and off. Aguilar and Blake joined her, then she went to tell appellant and Goodmanson she wanted to go home, but they were talking and did not listen to her; it seemed like a normal conversation about "guy stuff," but Goodmanson gave her a look she knew meant not to bother him, so she returned to the truck. Goodmanson had his .22 rifle. Back in the truck, Cattoor dozed again and was not aware anything unusual had happened when Aguilar and Blake left to walk home.

At this point, appellant got into the driver's seat and said "let's get out of here." Cattoor asked where Goodmanson was and appellant told her to "go see." Cattoor, thinking Goodmanson would not have allowed appellant to drive the truck because it was brand new, walked about 10 or 15 feet behind the truck and saw Goodmanson lying on the ground. She "freaked out," screaming and trying to shake Goodmanson, and appellant tried to restrain her. Appellant was holding the rifle; he pointed it at her and told her to shut up and get into the truck. He forced her into the truck, hitting her with the rifle, and started to drive away; she opened the door, jumped out and tried to run. Appellant followed her and forced her back into the truck by her hair. Cattoor was "terrified," feeling "almost like being with a serial killer." As appellant drove along the dirt road, she jumped from the truck again and ran. She saw appellant coming behind her with something in his hand, then remembered nothing else until she woke up in the hospital. She had a head injury that required about seven stitches, as well as bad scrapes and a back injury. Appellant never said anything to her about Goodmanson being shot by accident or in self defense.

Blake testified that, at the levee, he walked away with appellant and Goodmanson while his father and Cattoor stayed at the truck. Appellant had the .22 rifle. Appellant and Goodmanson were talking about Cattoor; Goodmanson told appellant to stay away from her and they shook hands. Appellant was "jumpy" and Goodmanson seemed calm. Blake returned to the truck, where his father and Cattoor were talking in the bed of the truck, and sat on the front passenger seat of the cab. Appellant came back to the truck and said Goodmanson "went fishing," then left again. Blake then saw appellant walking toward the truck holding boots, at which point his father told him they needed to leave. As he and his father walked away, Blake looked back and saw appellant grab Cattoor and slam her against the truck; she tried to run away, appellant followed her and said something, and Cattoor burst out crying. Blake then saw appellant drive the truck forward with Cattoor inside. As he and his father walked home through the field, Blake saw the truck turn onto the main road and drive to the house. When the truck was about 25 yards from the house, he saw Cattoor jump or get pushed out and fall on the ground.

At about 1:45 a.m. on August 27, 2006, Contra Costa County Sheriff's Deputy Timothy Houlihan was dispatched to 55 Bixler Road, after a caller reported there

3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

had been a shooting and the subject, Jared Alger, had a gun. As he was driving north on Bixler, Houlihan started to pull around a fire truck and saw a pickup truck coming at him at a "fairly high rate of speed." Houlihan stopped; the truck continued to within 20 yards of the officer, then made a sharp left turn onto a dirt road. Houlihan turned onto the dirt road and activated his emergency lights and siren, the truck increased its speed to about 50 miles per hour and Houlihan chased it for about a half mile until it stopped on the levee road. A large dust cloud from speeding down the road obscured Houlihan's vision of the truck and he stopped and waited about a minute for backup to arrive. The officers then approached the vehicle, guns drawn and flashlights on, but found no one in it. There was blood in the bed and cab of the truck, and a puddle of blood on the road in front of the pickup, along with a "camo" flashlight. There was also a dead rabbit forward of the truck and down the levee.

Houlihan heard yelling from the passenger's side of the truck and looked down the eight-foot embankment to see a man he identified as appellant next to the water, cradling Goodmanson's head. Other deputies were yelling at appellant to come up; they eventually pulled him up because of the steep slope. Appellant had a pocketknife in one pocket and two .22 rounds in another pocket. Asked who he was, he directed the officers to the ID in his wallet. He did not respond when asked if he knew where any weapons were, whether he was injured, or who the other person down the embankment was. When asked whether anyone was with him, appellant said, "maybe you should be looking." Officers immediately began searching the area and continued for several hours, using a dog and a heat-imaging device borrowed from the fire department. The mood was tense because the area was brushy, with many places to hide, and the officers did not know how many people might be involved. No one else was found and no weapons were located.

Once he was put into the patrol vehicle, appellant banged his head twice into the partition "pretty forcefully," and Houlihan told him to stop. He sat in the car with his eyes closed most of the time, and seemed emotional to Houlihan. He made several statements: "Steve was like my father, and I would call that man my father, and I learned a lot from him, and I didn't learn enough because I wasn't able to stop this." After about three and a half hours, Houlihan took appellant to the police station.

Officers who examined the scene on the levee road at about 5:00 a.m. found a fired .22 caliber cartridge case a few feet in front of the pickup truck, with a pool of what appeared to be blood nearby. A .22 rifle was recovered from the water next to the levee, about 15 feet from where Goodmanson's body had been found.

A police officer who interviewed Anna Cattoor after she was released from the hospital in the morning testified that she told him appellant had said, after she saw Goodmanson's body, "this is what you wanted."

Terence Wong, a criminalist who attended the autopsy of Goodmanson, testified that at the beginning of the autopsy, Goodmanson was clothed and had binoculars on his chest and a gun holster around his shoulders, but had only one sock and was not wearing shoes. One of the photographs Wong took showed a laceration on the back of the victim's head with a scale showing that the laceration measured four and a half centimeters (approximately one and a half inches). Other photographs showed a black circular perforation on Goodmanson's right cheek. Wong observed the pathologist, Dr. Peterson, locate and remove a bullet from Goodmanson's brain. He also observed Peterson determine the trajectory of the bullet by placing a metal rod through the perforation on the victim's cheek and the area from which he had removed the bullet. Wong documented this procedure with photographs that were

not used at trial. The court told the jury it had seen the photographs but the jury would be spared seeing them and instead would be shown a re-enactment on a mannequin of the procedure used to determine the bullet's trajectory.

Pathologist Gregory Reiber testified as an expert on the manner and cause of death and injury, based on his review of the autopsy report and documentation, including the approximately 150 photographs taken by Wong. As will be discussed in greater detail, Peterson had concluded the cause of Goodmanson's death was a gunshot wound to the head, describing an entrance wound on the cheek, a path through the base of the skull and a resulting injury to the brainstem that Reiber testified would be almost immediately fatal. Reiber testified that the photographs indicated a very close range injury; demonstrated on a Styrofoam mannequin head Peterson's probe showing the path of the bullet; and, with the prosecutor, role played scenarios for a struggle over the gun based on appellant's description of the incident. Reiber testified that it would have been possible for Goodmanson to shoot himself at the angle found in the autopsy but would have required his hand to be in a very awkward position.

Reiber also testified that an injury on the back of Goodmanson's head was inflicted when the victim was alive and could have resulted from a sharp blow with the butt end of a rifle or a fall on a hard surface, possibly falling backward and hitting his head on the packed earth surface of the levee after being shot while he was standing. The gunshot injury would have caused death within five minutes at the most. The autopsy report did not indicate that Goodmanson had defecated or voided his bladder at the time he was killed.

Reiber testified, based on photographs he was shown at trial, that appellant had abrasions and scrapes on his forehead, left wrist, right shin, top of the left shoulder and back of the right shoulder. The injury on his forehead could possibly have resulted from pounding his head against the barrier in a police vehicle but was more consistent with a scratch, as from fingernails or twigs.

On the evening of August 26, appellant left a voicemail message for his father. Appellant's father testified that appellant had agreed to help him pour a concrete pad and the message said that if appellant did not get to his father's place the next day, his father should look for him at 55 Bixler. Detective Cary Goldberg, who discussed this message with appellant's father, testified based on his report that the message was left at about 11:13 p.m. on August 26. The detective testified that appellant's father contacted him about the message, describing as "odd" a part of the message that said something like "if you don't hear from me tomorrow . . . the answers or the trail will lead you to 55 Bixler Road." He testified that appellant's father told him he thought the message suggested appellant knew there was going to be some kind of trouble that evening, although appellant's father was not aware of any personal problems between appellant and Goodmanson.

Appellant was interviewed by the police on August 27, several hours after the shooting, and a videotape of the interview was played for the jury. Appellant told the officers, "it's been a long standing issue that me and him hadn't finished each other off in a fight for many people. Many people wanted to see it." He said that Goodmanson "would talk crazy to [him] about wanting to leave this place, he was done," and appellant would argue with him. Appellant said that up to this point, he had not defended himself against Goodmanson, "we hadn't gone that far meaning both had come close multiple times, I guess. And I had always defused the situation." That night, Goodmanson was talking "crazy" about not wanting to be there, on the levee; then he shifted the conversation and talked about "moments of enlightenment." Appellant said Goodmanson would talk in such a way that at first

you would not know what he was talking about and "you're trying to understand advice from like a father figure," and as Goodmanson talked about these moments of enlightenment, appellant realized he was "speaking of what . . . death must be like . . . ."

Appellant said the conversation got "volatile," with Goodmanson giving him the option of "pack and run" or "me and him"; appellant was "scared with the crazy ways he's talking" but "looked to him [for] advice and things" and knew Goodmanson would not respect him if he ran. Goodmanson "egged [him] on," saying "you even have the rifle. . . . You got a gun." Appellant ditched the gun and figured he would "face" Goodmanson, and the two "tussled." Appellant said he did not want it to be "deadly" but Goodmanson was "pushing it" and yelled, "Come on! What do you want me to do? Well, do it." Appellant took this to mean "What do I have to do to get you to kill me?" As they were rolling on the ground, Goodmanson grabbed the gun. He lifted the gun at appellant, screaming at him, then appellant was on his back with Goodmanson on top of him, pulling the gun up with one hand. As Goodmanson pulled the gun up, holding the butt and the handle, appellant pushed the barrel or stock. "[I]t veers up, whacks him in the head and ba[n]g . . . he rolls off of me, . . . I'm looking at him and he's, fuckin, sitting there, you know, farting and fucking. You know his shits fuckin coming out of and he's pissing and everything else. And, I mean, at this, at this point I found (unintelligible) I pretty much know he fuckin, pretty fuckin dead, right?" Appellant said he had a lot of respect for Goodmanson and could not watch him suffering, so he shot him again "like a wounded animal." Because of their relative positions, appellant said the first shot "should had been right in here by the right [e]ar."

Appellant said he ran back to the truck where Aguilar and Cattoor were, not knowing "how they're gonna to react because it seemed to me like other people have said, this is planned. This was planned. It seemed like it was planned by a lot of people. By everyone but me. . . . I've been the one that had avoided it several times before." When one of the officers commented, "Almost like that's why you [got] called out there tonight," appellant said, "Oh, he told me that's why. . . . He told me, you know, at first when he was bringing it up like I would accept it or jump on the idea. One of his attempts to talk me into it during that period I was talking about talking. . . . like he had other people he considered for the role of his possible death, you know. . . . But me. . . . He wanted as his. . . . He explained that as me being I got something. I don't know what it is. It's a good thing kinda thing, but then that's also why he explained why he had gotten me out there." Asked about why he took Goodmanson's boots, appellant said he had hoped to "get them to the water for him." He told the officers he had last used methamphetamine in the morning and had a beer just before the shooting. He insisted he never hit Cattoor.

A criminologist tested stains on appellant's clothing and determined that there was blood on his tee shirt and on his shoes.

**Defense**

Appellant described Goodmanson as a "very close" friend: He did construction work for Goodmanson, spent time with him fishing, camping, shooting, hunting and other activities, and lived with him for periods of time. Goodmanson was older than appellant and something of a father figure to him, but also used appellant as a model for himself. Appellant had a sexual relationship with Cattoor before she was involved with Goodmanson. Later, appellant slept with her and Goodmanson "kind of laughed about it" but warned appellant, "that's my girl now." Prior to August 26, Goodmanson had made it "official" that he and Cattoor were together. He and appellant had made an agreement that appellant would not respond to Cattoor, who

6

appellant testified was "flirty" and would "throw herself on you," and that Goodmanson would handle whatever Cattoor did. Appellant denied being jealous of Goodmanson.

When appellant arrived at Aguilar's house that night, Cattoor ran to him and jumped on him; he held his arms out, making a point of not hugging her back. Appellant felt uncomfortable because of the situation with Goodmanson and Cattoor. Everyone knew the history and it seemed strange to appellant that they were acting like nothing was going on and did not answer when he asked where Goodmanson was. Appellant felt that Cattoor was flirting with him and that the others thought there was going to be a fight between him and Goodmanson. Appellant was concerned about his relationship with Goodmanson.

Appellant heard gunshots that came from across the street, where Goodmanson and Blake were by the water, and went to join them. He tried to talk to Goodmanson about Cattoor, to say he was keeping to the agreement although Cattoor was being sexually provocative, but Goodmanson avoided the conversation and they returned to the house. Later, appellant, Goodmanson, Cattoor, Aguilar and Blake left in Goodmanson's truck and went to the levee. Appellant got out and went after a rabbit they had seen, taking a .22 rifle that was kept at Aguilar's house and used by "everybody." Goodmanson caught up with him, and appellant tried again to talk to Goodmanson about Cattoor. Goodmanson said, "this isn't going to work like I thought it was then," and picked up his pace, walking ahead of appellant. Eventually, they stopped and agreed on a target to shoot at. Blake caught up with them. Appellant tried to shoot at something and the rifle jammed; Goodmanson tried to take the rifle and appellant "yanked back just out of safety." Appellant was "nervous" because "you don't handle guns that way." The rifle jammed again as appellant tried to clear it, Goodmanson grabbed the rifle aggressively and appellant let go of it. Appellant asked what Goodmanson meant by "it's not going to work." Goodmanson told Blake to go back to his father, Blake left, and appellant pursued the conversation, but Goodmanson remained evasive, his tone "aggressive and sharp." Appellant backed off the conversation and they started to talk about going after frogs, having heard a gunshot they took to mean Aguilar had shot the rabbit they were looking for. Goodmanson was shooting at frogs appellant could not see. Appellant testified that the "whole situation" that evening did not feel "natural" to him, as though everyone else knew something he did not.

After walking a bit more, Goodmanson began to talk about many problems he had with appellant; as appellant tried to voice his side of things, the conversation escalated and became "volatile." Goodmanson told appellant, "you don't get it, better figure it out, or you're never leaving this place." Appellant did not know whether Goodmanson said this more than once but it was "kind of the theme." At some point, Cattoor came and tried to "butt in." Appellant wanted to hear what she had to say because he felt she was the real problem that Goodmanson was not talking about, but Goodmanson got her to leave.

Goodmanson became aggressive with appellant and the two began to fight, rolling on the ground. At this point, neither was holding the gun. It was not uncommon for them to fight, but it generally did not get serious; while both men carried knives, they had never used them against each other. This time, the fight "wasn't even kind of friendly" and appellant was scared of Goodmanson in a way he had not been before. As they struggled, while Goodmanson was on top of appellant, he grabbed the gun and tried to bring the barrel down on appellant's head. Appellant could not believe the fight had gone "this far" and thought Goodmanson was trying to kill him. As he felt the barrel slide across his head, appellant pushed the gun up, heard a bang and felt Goodmanson "jerking" on top of him. Goodmanson's bowels

"loosen[ed]," which appellant took to mean he was dead. He rolled Goodmanson off him. Appellant had seen the video of the interview in which he told the police he shot Goodmanson after rolling his body off, but testified that he did not do this and did not know why he would have said he did.

Appellant's memory of what happened after this was vague. He went back to the truck, finding Aguilar and Cattoor in the back, and thought he heard Aguilar say "I didn't think he had the balls to do it." Appellant was scared and worrying about how he had felt like "the one left out of something" the whole night; something was "odd" from the time he arrived at Aguilar's house. Aguilar asked what happened, but appellant thought he already knew, and Cattoor said "some crazy shit, like, well, both of you just relax, we'll have a beer and we'll talk this out." Appellant went back to Goodmanson. He testified that before watching the video of his police interview, he would not have remembered picking up Goodmanson's boots. He testified that his motivation in taking the boots was to show respect for Goodmanson by taking his boots "where he wanted to be" because Goodmanson had said he did not want to be on the levee and wanted to be shark fishing. When he returned to the truck, Aguilar "had a gun on" him, then left with Blake.

Appellant tried to talk to Cattoor, who was asking him what happened and screaming at him. She went to Goodmanson's body and jumped on him, which seemed "fake" to appellant. He was angry at her and "might have said is this what you wanted? Because the bitch kept throwing herself at me." Appellant pulled her away from Goodmanson and she went back to the truck "pretty much willingly" and got in. Appellant drove back to Aguilar's house, to get to a phone. Cattoor jumped out of the truck and appellant got out, picked her up and put her back in. Cattoor was screaming that she could not go with him because she had a child, but appellant was not trying to take her anywhere. He helped Cattoor to the couch in Aguilar's house and asked Heather to take care of her, then walked through the house and checked the field, looking for Aguilar. He returned to the door he had initially entered but found it locked, walked toward the back and was met by Aguilar pointing his "30.06" at him. Aguilar said something about running, then told appellant he should "get counsel" and then, as the police arrived, that it was too late. Appellant drove back toward Goodmanson with a police car following him; he testified that he was not trying to run from him but to "take everybody." He testified that he went to the levee and this "must have been" when he threw the gun into the water. He remembered having Goodmanson in his lap and trying to tell the police that if he let him go, Goodmanson would fall into the water.

Appellant testified that he had used a line of methamphetamine at about 10:00 or 11:00 o'clock in the morning on August 26, and had a beer or two at Aguilar's house that night.

Appellant testified that he loved Goodmanson, never wanted what happened to happen and never wanted Goodmanson dead. He loved Cattoor as a friend but would have had a hard time being in a relationship with her because he "knew not to trust her."

Appellant testified that the blood draw during his police interview may have affected his ability to comprehend what was going on, to be honest, and to be influenced by the situation, stating he was hypoglycemic and could faint from having blood drawn.

Goodmanson's blood tested positive for methamphetamine, cocaine, a metabolite of cocaine and ethanol. A defense expert witness testified that methamphetamine, cocaine and alcohol, in adequate doses, are all correlated with violent behavior, so

that the combination of these substances could be "explosive." Appellant's blood tested positive for methamphetamine at a lower level than Goodmanson's, and no other substances were detected.

An emergency medical technician (EMT) who spoke with appellant at the Martinez Field Operations building on August 27 testified that appellant complained that he was nervous, stressed and had a headache; he did not recall appellant saying he was dizzy and confused. His partner, after reviewing a tape of the encounter, recalled that appellant said he was dizzy and said something about his speech, but stated that appellant did not actually appear to be dizzy and his speech was clear. Appellant initially said he wanted to go to the hospital, but while the medical personnel went to get a gurney, a sheriff's officer talked to appellant and then told them appellant no longer wanted to go.

Notice of Electronically Lodged Documents ("Lodged Documents"), Ex. 8, Unpublished September 19, 2013 Opinion of the California Court of Appeal ("CCA Op.") at 3–16 (footnotes omitted) [Dkt. No. 17-5].

Alger's trial commenced on April 27, 2009 in California Superior Court, County of Contra Costa. *Id.* at 2. On May 27, 2009, a jury found him guilty of: (i) voluntary manslaughter (Cal. Pen. Code § 192(a)), with the special enhancement finding that Alger personally used a firearm during the commission of the offense (Cal. Pen. Code § 12022.5(a)(1)); (ii) false imprisonment (Cal. Pen. Code § 237(a)); and (iii) misdemeanor assault (Cal. Pen. Code § 241(a)). Petition for Writ of Habeas Corpus ("Pet.") at 2, 11 [Dkt. No. 1]; *see* Lodged Documents, Ex. 1, Clerk's Transcript ("CT") at 724, 729–30, 733 [Dkt. No. 13-8]. The jury found him not guilty on counts of murder (Cal. Pen. Code § 187); kidnapping (Cal. Pen. Code § 207(a)) and attempted kidnapping (Cal. Pen. Code §§ 207, 664); and assault with a deadly weapon with force likely to produce great bodily injury (Cal. Pen. Code §§ 245(a)(1)–(2)). CCA Op. at 2; *see* CT at 722–23, 725–28, 731–32. On September 4, 2009, he was sentenced to a total of 16 years and 8 months in state prison. Pet. at 2; *see also* CT at 766–68. He is currently in custody at La Palma Correctional Center in Arizona. Pet. at 2.

Alger filed a timely appeal, and on January 12, 2012, the California Court of Appeal reversed the convictions on the ground that Alger's confrontation rights had been violated.[1] Lodged Documents, Ex. 6, Unpublished January 12, 2012 Opinion of the California Court of

_____

[1] Having found grounds for reversal, it did not address his right to counsel claim. *See* Jan. 12, 2012 CCA Op. at 34.

Appeal ("Jan. 12, 2012 CCA Op.") [Dkt. No. 17-3]. On May 22, 2013, the California Supreme Court directed the California Court of Appeal to vacate its 2012 opinion and reconsider the matter in light of several cases decided since its issuance. Lodged Documents, Ex. 7, Order of the California Supreme Court Directing Remand (citing *People v. Lopez*, 55 Cal. 4th 569 (2012); *People v. Dungo*, 55 Cal. 4th 608 (2012); *People v. Rutterschmidt*, 55 Cal. 4th 650 (2012); *Williams v. Illinois*, 567 U.S. 50, 132 S. Ct. 2221 (2012)) [Dkt. No. 17-4].

On remand, the California Court of Appeal affirmed the convictions in full, this time rejecting Alger's confrontation claim. *See* CCA Op. at 16–28. It proceeded to address and reject his claim that the trial court abused its discretion in denying his request for a continuance to allow retained counsel to replace his public defender. *Id.* at 39–43. On December 11, 2013, the California Supreme Court denied review. Pet. at 13; *see* Lodged Documents, Ex. 10, Order of the California Supreme Court Denying Review [Dkt. No. 17-7]. This federal habeas petition followed.

Alger brings the same claims addressed by the California Court of Appeal on direct appeal. He alleges that his Sixth Amendment rights were violated when the trial court: (1) allowed an autopsy report into evidence, despite the report's author being absent at trial; and (2) denied his request to substitute privately retained counsel for appointed counsel. Pet. at 6.

## LEGAL STANDARD

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal district court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

## DISCUSSION

## I.     RIGHT TO CONFRONTATION

Dr. Reiber, a different pathologist than the one that conducted Goodmanson's autopsy, reviewed the autopsy report and testified "as an expert in the manner and cause of death and injury." Lodged Documents, Ex. 2, Reporter's Transcript ("RT") at 899 [Dkt. No. 15-9]. Alger asserts that admitting the autopsy report and testimony of Reiber violated his rights under the Confrontation Clause. Pet. at 19–26.

The Sixth Amendment's Confrontation Clause grants criminal defendants "the right . . . to be confronted with the witnesses against [them]." U.S. Const. amend VI. This right bars all "testimonial statements" unless: (i) the declarant witness is unavailable or otherwise unable to testify; and (ii) the defendant had a prior opportunity to cross-examine the witness. *See Crawford v. Washington*, 541 U.S. 36, 59 (2004) ("Testimonial statements of witnesses absent from trial [are] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."). In *Davis v. Washington*, the Supreme Court was presented with the question of what statements qualify as "testimonial." 547 U.S. 813, 821 (2006). It decided that a "testimonial statement" must have "the primary purpose of . . . establish[ing] or

prov[ing] past events potentially relevant to later criminal prosecution." *Id.* at 822; *see also Bullcoming v. New Mexico*, 564 U.S. 647, 659 n.6 (2011) (describing *Davis*'s definition). The contours of when statements qualify as testimonial remain unclear. *See Williams*, 567 U.S. at 90–92 (Breyer, J., concurring)(discussing varying approaches to determination); *cf. Hensley v. Roden*, 755 F.3d 724, 733–34 (1st Cir. 2014) (noting the lack of consensus in *Williams*); *United States v. Mallay*, 712 F.3d 79, 95 (2d Cir. 2013) ("No single rationale of the *Williams* case enjoys the support of a majority of the Justices."); *Dungo*, 55 Cal. 4th at 622 ("The question of what out-of-court statements are and are not testimonial has divided the justices of the United States Supreme Court, whose decisions have not yet yielded a clear definition or test.") (Werdegar, J., concurring). But the Supreme Court has provided a "core class of testimonial statements" that includes:

> '*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statements would be available for use at a later trial.'

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310 (2009) (quoting *Crawford*, 541 U.S. at 51–52) (internal quotation marks and citations omitted).

The Supreme Court has, at times, deemed lab reports "testimonial hearsay." In *Melendez-Diaz*, it concluded that a sworn certificate from a lab analyst identifying a controlled substance was testimonial because it served the functional equivalent of in-court testimony. 557 U.S. at 310–11. In *Bullcoming*, it found that a certificate regarding a blood alcohol test introduced at trial by a lab analyst who did not perform the test sufficiently "formalized" to constitute testimonial evidence. 564 U.S. at 664. But at other times it has rendered lab reports nontestimonial. *See Williams*, 567 U.S. at 67–86 (plurality holding that expert's reliance on outside lab report to inform his testimony whether defendant's DNA profile matched that of perpetrator did not implicate the Confrontation Clause). It has not explicitly decided whether an autopsy report is testimonial in nature.[2]

---

[2] In *Williams*, Justice Breyer suggested that autopsy reports do not implicate the Confrontation

Confirmation Clause claims are subject to harmless error analysis. *United States v. Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004). For purposes of federal habeas corpus review, the standard applicable to violations of the Confrontation Clause is whether the inadmissible evidence had an actual and prejudicial effect upon the jury. *See Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Alger argues that autopsy reports contain testimonial hearsay, and he insists that admitting one into evidence without the opportunity to cross-examine the report's author is a violation of the Sixth Amendment. Pet. at 27. He also contends that allowing a surrogate to testify about the contents of the autopsy report in place of the absent author does not remedy the violation. *Id.* Lastly, he asserts that, contrary to the California Court of Appeal's finding that the autopsy report contained no statements addressing whether the shooting could have occurred in the manner described, the Coroner's Report—of which the autopsy report was a part of—had the words "Classification: Homicide/Gunshot" on the first page. Reply or Traverse to Respondent's Answer ("Reply") at 4 [Dkt. No. 18-1]. According to Alger, the word "homicide" relates to a manner of death, and as such, the Court of Appeal's foundation for finding harmless error was incorrect. *Id.* at 5.

The Court of Appeal summarized Reiber's testimony at trial as follows:

Reiber and Peterson had been part of the same forensic medical group prior to Peterson relocating out of state in 2007, and they had reviewed each other's work

---

Clause:

> Finally, to bar admission of the out-of-court records at issue here could undermine, not fortify, the accuracy of factfinding at a criminal trial. Such a precedent could bar the admission of other reliable case-specific technical information such as, say, autopsy reports. Autopsies, like the DNA report in this case, are often conducted when it is not yet clear whether there is a particular suspect or whether the facts found in the autopsy will ultimately prove relevant in a criminal trial. Autopsies are typically conducted soon after death. And when, say, a victim's body has decomposed, repetition of the autopsy may not be possible. What is to happen if the medical examiner dies before trial?

*Williams*, 567 U.S. at 97–98 (Breyer, J., concurring). The Supreme Court has since declined to address the precise issue. *See* Petition for Writ of Certiorari, *Medina v. Arizona*, 134 S. Ct. 1309 (2014) (raising the sole issue on appeal as to "[w]hether an autopsy report created as part of a homicide investigation, and asserting that the death was indeed caused by homicide, is 'testimonial' under the Confrontation Clause").

13

from time to time. Reiber testified that, based on the report and photographs, it appeared Peterson had conducted a traditional autopsy that was "consistent with the information he had in front of him at the time." Reiber testified that forensic pathologists tend to follow a "standard routine" in conducting autopsies and that having worked alongside Peterson, he knew that Peterson followed the same sort of procedures Reiber used. Reiber described the general process, including that pathologists usually dictate a description of their actions and observations as they proceed through the autopsy. The recorded dictation would then be transcribed, the transcription reviewed and corrected by the pathologist who performed the autopsy, and the final transcribed report signed by the pathologist. Peterson had signed off on the autopsy report in the present case. Reiber testified this report was the type typically prepared in the ordinary course of business in his medical group and that such reports were prepared concurrently with or just after the actual autopsy. The group worked on a contract basis for Contra Costa County and the reports were kept at the coroner's office. The report of Goodmanson's autopsy was admitted into evidence without objection from the defense.

Reiber explained that the autopsy report and photographs showed a gunshot entrance wound on the victim's right cheek and a wound path through the base of the skull to the brainstem at the bottom of the skull. Peterson described the brain stem as lacerated, or torn, a type of injury that would be almost immediately fatal. The injuries were "pretty clearly" documented by photographs corresponding to Peterson's description. For the actual laceration, Reiber was relying on Peterson's description; the photographs of the injury were not as clear because of the amount of surrounding tissue that had been removed to get to the location of the injury. Reiber was able to see a hole near the bottom of the brain where the bullet passed through and testified that "[t]he location of the bullet path would pretty clearly involve the brainstem in a way that I would expect to result in a fatal injury also." The report described finding a small caliber projectile near the place where the brainstem connects to the spinal cord.

Reiber reviewed photographs of the probe Peterson used to show the path of the bullet and, based on the information described in the report and the photographs, believed the probe accurately represented the bullet's path. He had tried to recreate this investigation using a Styrofoam mannequin head and demonstrated this recreation at trial. Three of the autopsy photographs in particular showed the angle of the probe from three different angles well enough that Reiber believed his reproduction of what Peterson had done was "very close" to accurate, but the styrofoam material made it hard for him "to get the right-to-left angle quite as steep."

The photographs also provided information about the angle of the bullet's entry in that a dark area of searing and soot indicated that one end of the barrel was tipped slightly closer to the skin than the other. The deposit on the skin indicated a very close range injury, with the barrel probably one to two inches from the skin, depending on the type of weapon used. Reiber testified that if the victim was standing erect, the lower end of the barrel would have been slightly closer to the skin than the upper end, indicating a slight upward angle of entry.

Using the rifle in evidence, the prosecutor and Reiber attempted to demonstrate scenarios based on appellant's description of the incident, in which two combatants struggling for the rifle face-to-face on the ground could have caused the rifle to shoot with the trajectory reflected in the autopsy report. Reiber testified that for Goodmanson to have been shot at that angle, he would have had to have his hands near the trigger and be looking down at his hands, rather than at his opponent, with his head tilted toward the barrel. If Goodmanson initially had control of the gun, as

appellant described, it would have been possible for Goodmanson to accidentally shoot himself in the face at the angle found in the autopsy, but it would have required his hand to be in an "extremely awkward position" with his index finger on the trigger, or for him to have had a "reverse grip" on the gun, with his index finger at the breach end of the gun and his thumb inside the trigger guard.

Reiber also described a series of small bruises and scrapes across Goodmanson's lower forehead, scraped areas on the top of the head that appeared to Reiber to have occurred after death, a laceration from a blunt blow to the lower back of the head, scrapes on the left cheek and right side of the neck, scratches on the chest, bruises on the left upper arm and forearm, and bruises and scrapes on the lower left armpit. A photograph of the injury on the back of the head showed a type of wound that could have resulted from a sharp blow with the butt end of a rifle or a fall on a hard surface, as well as that the wound was inflicted when the victim was alive. Reiber opined that the injury could have resulted from Goodmanson being shot while he was standing, then falling backward and hitting his head on the packed earth surface of the levee. The autopsy report did not indicate that Goodmanson had defecated or voided his bladder at the time he was killed, facts Reiber would expect to find in the report if observed during the autopsy.

CCA Op. at 16–18.

In rejecting Alger's autopsy report claims, the California Court of Appeal stated:

The critical question in the present case was *how* Goodmanson came to be shot and whether the shooting could have occurred in the manner appellant described. The autopsy report contained no statements addressing this issue. It was Reiber's independent testimony and re-enactment of the struggle that informed the jury it would have been very unlikely the scenario appellant described could have resulted in the bullet following the trajectory described in the autopsy report. The path of the bullet, determined by the probe used during the autopsy, was part of the pathologist's examination of the decedent's external and internal injuries necessary to "'support diagnoses opinions, and conclusions'" and "governed primarily by *medical* standards rather than by legal requirements of formality or solemnity." (*Dungo, supra,* 55 Cal.4th at p. 624, conc. opn. of Werdeger, J.) As with the other descriptive portions of the report, "there was no prospect of fabrication or incentive to produce anything other than a scientifically reliable report. The purpose of this part of the autopsy report is 'simply to perform [the pathologist's] task in accordance with accepted procedures.' [Citation.]" (*Dungo, supra,* 55 Cal.4th at pp. 627., 630, conc. opn. of Chin, J.) The autopsy report and Reiber's testimony about its contents simply provided the basis for Reiber's independent conclusions and demonstration to the jury, and appellant was free to cross-examine Reiber on these points. Accordingly, his confrontation rights were not violated.

The facts that the autopsy report was introduced into evidence and Reiber described the nontestifying pathologist's conclusion as to cause of death do not alter our conclusion. The conclusion stated in the autopsy report, and related by Reiber at trial, was that Goodmanson's death was caused by a gunshot wound to the head. ~(RT 910–911, Exh. 31a)~ This fact, however, was in and of itself of little consequence: There was no question that Goodmanson had been killed by a gunshot shot to the head. As we have said, the critical testimony was that describing the *manner* of death, and that testimony was the independent opinion of the witness at trial. Therefore, any error in admitting the autopsy report or Reiber's description of its conclusion would have been harmless beyond a reasonable doubt. (*People v. Pearson* (2013) 56 Cal.4th 393, 463.) For this reason, we need not

determine whether the report itself, or Reiber's testimony about the conclusion it reached, were testimonial in nature.

*Id.* at 26–28 (emphasis in original).

Because there is still a lack of clearly established federal law as to whether autopsy reports are testimonial, the California Court of Appeal's denial of Alger's confrontation claim cannot be said to be contrary to, or an unreasonable application of, such law. Moreover, I agree with the Court of Appeal's determination that Reiber's testimony was comprised of his own independent opinions and conclusions. Here, the autopsy report contained no statement as to *how* Goodmanson came to be shot, or whether the shooting could have occurred in the manner that Alger described. As the California Court of Appeal concluded, those opinions were introduced through the expert testimony of Reiber, who was present at trial and available for cross-examination.

The fact that the word "homicide" appeared on the Coroner's Report does not alter this conclusion. Homicide does not rigidly indicate criminal liability; it merely is defined as the act of one human killing another. A homicide can translate into a number of different legal categories—i.e., murder, manslaughter, justifiable homicide—all of which depend on the circumstances of death. In some circumstances, homicides can be accidental or legally justified. A notable example is a homicide committed in self-defense. Because the word "homicide" does not weigh upon "whether the shooting could have occurred in the manner [Alger] described," it does not contradict the California Court of Appeal's finding that "[t]he autopsy report contained no statements addressing th[e] issue." *See* CCA Op. at 28. And even if the introduction of the autopsy report was error, it was harmless. Alger had the opportunity to cross-examine Reiber on the manner and cause of death and present his evidence and argument in support of his theory. Under these circumstances, it cannot be said that "the inadmissible evidence had an actual and prejudicial effect upon the jury." *Hernandez*, 282 F.3d at 1144.

Lastly, the California Court of Appeal's denial of Alger's confrontation claim did not result in a decision that was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The appellate court

found that Reiber's testimony was the independent opinion of an expert witness at trial. Given the questions asked and answers provided at trial by Reiber, that determination was not unreasonable. Furthermore, it was not unreasonable for the court to find that "any error in admitting the autopsy report or Reiber's description of its conclusion would have been harmless beyond a reasonable doubt" without deciding whether the report was testimonial in nature. *See* CCA Op. at 28. Regardless of whether autopsy reports are testimonial—which has not been clearly established— "an expert witness may offer opinions based on . . . inadmissible testimonial hearsay, as well as any other form of inadmissible evidence, if 'experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject.'" *United States v. Vera*, 770 F.3d 1232, 1237 (9th Cir. 2014). Moreover, even if the autopsy report had not been admitted into evidence, Reiber was permitted—as an expert witness—to base his opinions and conclusions on it. Therefore, it was entirely reasonable for the court to find any error in admitting the report or Reiber's description of its conclusions harmless beyond a reasonable doubt.

Because the California Court of Appeal's determination was reasonable, and not contrary to clearly established Supreme Court precedent, it is entitled to deference under AEDPA. Alger's confrontation claim is DENIED.

## II.     SUBSTITUTION OF COUNSEL

Alger asserts that his Sixth Amendment right to counsel was violated when the trial court denied his request to replace an appointed public defender with privately retained counsel twenty days before trial. Pet. at 27. The denial of a motion to substitute counsel implicates a defendant's Sixth Amendment right to counsel and is properly considered in federal habeas. *See Bland v. California Dep't of Corrections*, 20 F.3d 1469, 1475 (9th Cir. 1994), overruled on other grounds by *Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000).

That said, "[t]he Sixth Amendment right to choose one's own counsel is circumscribed in several important respects." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Among its confines, "the Sixth Amendment does not guarantee a 'meaningful relationship' between a client and his attorney." *Stenson v. Lambert*, 504 F.3d 873, 886 (9th Cir. 2007) (quoting *Morris v. Slappy*, 461 U.S. 1, 14 (1983)). Accordingly, when a defendant makes a motion for substitution of

counsel, the trial court "balance[s] the resulting inconvenience and delay against the defendant's important constitutional right to counsel of his choice." *United States v. Moore*, 159 F.3d 1154, 1158–59 (9th Cir. 1998) (internal quotation marks omitted); *see United States v. Gonzalez-Lopez*, 548 U.S. 140, 152 (2006) (a trial court has "wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar") (citation omitted); *Morris*, 461 U.S. at 11–12 ("[B]road discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel.") (internal quotation marks omitted).

Alger contends that, because he was attempting to replace appointed counsel with privately retained counsel, he had no duty to show ineffective assistance of counsel or conflict. Pet. at 28. According to Alger, in "holding a *Marsden*[3] hearing to determine whether [appointed] counsel was competent before deciding whether [he could be replaced] with retained counsel," the trial court "confused the standard" for substitution of counsel, and thus deprived Alger of his right to the counsel of his choosing. *Id.* at 32.

The trial court's decision to deny Alger's substitution of counsel request is summarized as follows:

> In late March 2009, with trial scheduled for April, retained counsel Eric Babcock sought to come into the case with a continuance until September to allow him to prepare for trial. The prosecution objected, pointing out that the murder occurred in August 2006, appellant was arraigned in the fall of 2007, and the case had been continued several times despite letters from the victim's family urging the court to move the case forward. The same public defender had represented appellant throughout and the prosecutor expressed frustration that the prosecution had made an offer within the last week, "the first substantive conversations we've had with the defense," and within three or four working days, appellant wanted a new lawyer. Babcock stated that his firm had been contacted a few days before and the financial arrangements had been made two days before. The court denied the substitution motion and appellant immediately said he had a *Marsden* motion based on a serious conflict with his public defender. After hearing appellant's complaints about the public defender's representation and her response, the court denied the *Marsden* motion, a ruling appellant has not challenged on this appeal.
>
> The next day, a different attorney from the retained law firm, Shannon Dorvall, represented that appellant's case had been reassigned within the firm to herself and

---
[3] *People v. Marsden*, 465 P.2d 44 (Cal. 1970).

another attorney, and that they could be ready for trial the first week of May. Dorvall had not reviewed any of the material related to the case, and the prosecutor stated that while he would have no problem with a trial date in early May, he was concerned that once the new attorneys reviewed the discovery, they would find a need for further investigation or preparation and seek additional continuances. After expressing concern about Dorvall saying she would be prepared without knowing anything about the case, the court arranged for her to review the case materials with the public defender and stated that if Dorvall then represented she would be ready for trial in early May, the court would probably grant the motion.

The following day, before a different judge, Dorvall and Vince Imhoff, also from the retained law firm, represented that they could be ready for trial in early May. The prosecutor reiterated his concern that unexpected issues would require additional delay, reminding the judge that she had previously stated there would be no further continuances, that the victim's family were "beside themselves" and that the public defender was ready to go to trial. Dorvall and Imhoff conceded they could not rule out the possibility of needing a continuance but promised not to employ delay as a tactic.

The trial court commented on the "balancing act" at issue, weighing "[p]rejudice to the People, prejudice to the victim's family waiting this long and having further a delay, against the Sixth Amendment right to counsel of choice," and expressed reluctance "to allow a substitution at this late date when we have very competent counsel ready to say ready." When retained attorney Imhoff urged that appellant and his family had lost faith in the public defender, and the court was informed that appellant's *Marsden* motion had been denied, the court responded: "If I were quite confident that would effect a continuance of only three or four weeks, I would be inclined to grant the motion… . But in this case he was held to answer in September of '07. This case has been set for trial multiple times. We have had victims who have spoken to the Court and are obviously having tremendous difficulty with the multiple continuances in this case. We have counsel who has been found to have been competently representing the defendant, so there's not an issue of competency here. And we have already—I'm hearing all kinds of second-guessing going on that gives me very little confidence this is going to be a brief continuance." The court denied the motion, explaining, "I too take seriously the defendant's right to counsel of his choice. [¶] However, that right is not absolute, and . . . I think it's not appropriate in this case where we are just two weeks from trial in a case that's been pending for a couple of years, a crime that occurred on August 27, 2006, to, at this late date, suddenly be substituting counsel when I have absolutely no confidence that there will not be repeated delays at this time." Accordingly, the court denied the request to substitute counsel.

As Imhoff pressed the court to reconsider, the court briefly suggested the possibility of the retained attorneys being ready to proceed on the scheduled trial date of April 13, then agreed with the prosecutor's objection that the problem of potential continuances remained. The trial court believed in retained counsels' commitment but felt they could not know enough about the case to be sure they could proceed, whereas the public defender had been on the case for two and a half years and knew it "inside and out."

CCA Op. at 39–41.

In rejecting Alger's right to counsel claims, the California Court of Appeal provided:

The right to the effective assistance of counsel includes a right to retain counsel of

one's own choice. (*People v. Courts* (1985) 37 Cal.3d 784, 789 (*Courts*).) Trial courts "have the responsibility to protect a financially able individual's right to appear and defend with counsel of his own choosing" and must "'make all reasonable efforts to ensure that a defendant financially able to retain an attorney of his own choosing can be represented by that attorney.'" (*Id.* at p. 790, quoting *People v. Crovedi* (1966) 65 Cal.2d 199, 207.) "In addition, counsel, 'once retained, [must be] given a reasonable time in which to prepare the defense.' (*People v. Haskett* (1982) 30 Cal.3d 841, 852.) Failure to respect these rights constitutes a denial of due process." (*Courts*, at p. 790.)

But a defendant's right to be represented by a particular attorney is not absolute, as "other values of substantial importance, for instance that seeking to insure speedy determination of criminal charges, demand recognition." (*People v. Crovedi*, *supra*, 65 Cal.2d at pp. 206–207.) "[T]he right 'can constitutionally be forced to yield *only* when it will result in significant prejudice to the defendant himself or in a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case.' (*People v. Crovedi*, *supra*, 65 Cal.2d at p. 208, italics added; *Maxwell v. Superior Court* [(1982)] 30 Cal.3d [606,] 613–614.) The right to such counsel 'must be carefully weighed against other values of substantial importance, such as that seeking to ensure orderly and expeditious judicial administration, with a view toward an accommodation reasonable under the facts of the particular case.' (*People v. Byoune* [(1966)] 65 Cal.2d [345,] 346.)" (*Courts*, *supra*, 37 Cal.3d at p. 790.)

"Limitations on the right to continuances in this context are similarly circumscribed[,]" and requests should be accommodated "'to the fullest extent consistent with effective judicial administration.'" (*Courts*, *supra*, 37 Cal.3d at pp. 790–791.) The granting of a continuance is within the discretion of the trial court and may be denied, for example, "if the accused is 'unjustifiably dilatory' in obtaining counsel, or 'if he arbitrarily chooses to substitute counsel at the time of trial.' (*People v. Byoune*, *supra*, 65 Cal.2d at pp. 346–347.)" (*Courts*, *supra*, 37 Cal.3d at pp. 790–791.) "In deciding whether the denial of a continuance was so arbitrary as to violate due process, the reviewing court looks to the circumstances of each case, "'particularly in the reasons presented to the trial judge at the time the request [was] denied."'" ([*Crovedi*, *supra*, 65 Cal.2d] at p. 207, quoting *Ungar v. Sarafite* [(1964)] 376 U.S. [575,] 589.)" (*Courts*, *supra*, 37 Cal.3d at p. 791.)

Appellant urges that his request to substitute retained counsel was made 20 days before trial, not on the day or eve of trial, and suggests there was no evidence substitution of counsel would have inconvenienced the court or the prosecution. But this is not a case like *Courts*, in which the defendant began to secure retained counsel within two months of arraignment and a month before the date set for trial. When appellant sought to retain counsel, his case had been pending for well over two years, during all of which time he had been represented by the same public defender. Trial had already been continued multiple times, and the victim's family had made clear to the court its frustration with the slow pace of the proceedings. The court was well within the bounds of reason to weight heavily the need to avoid further delay in bringing the case to trial. In light of the nature of the case and potential issues involved in appellant's defense, the court was also well within the bounds of reason to question the ability of retained counsel to bring the case to trial without significant delay. Retained counsel knew nothing about the case when appellant's request was initially raised and had only briefly reviewed the file when they represented they could be ready for trial in short order. The court made clear that it did not doubt the good faith of retained counsel, but rather was concerned with the practical reality of taking over a case of this nature at such a late stage. Even counsel acknowledged they could not be absolutely certain there would be no

20

need for further delays. Confronted with an entirely uncertain scenario if the substitution motion was granted and, on the other hand, appointed counsel who had worked the case for more than two years and was ready for trial, we cannot find an abuse of discretion in the court's denial of the substitution motion.

*Id.* at 41–43.

Alger's right to counsel claims are entirely based on his contention that the trial court deliberately held the *Marsden* hearing for the purpose of ascertaining the public defender's competence before ruling on the March 27, 2009 substitution of counsel motion. But this mischaracterizes the record. Alger's *Marsden* motion was clearly separate from his substitution of counsel motions. On March 25, 2009, the trial court first considered and reasonably denied a motion for substitution of counsel that would have necessitated a six-month continuance. The record unequivocally reflects it was only after this motion was denied that Alger then requested a *Marsden* hearing to address an alleged conflict with his appointed counsel. At no time during this separate *Marsden* hearing did the trial court suggest that the public defender's competence had any bearing on the earlier denial of his substitution request.

Furthermore, only after the *Marsden* hearing was completed and appointed counsel found competent did Alger then renew his motion to substitute counsel. On March 27, 2009, in denying Alger's renewed substitution motion, the trial court—rather than relying on its earlier *Marsden* determination that the public defender was competent—explicitly focused on the "balancing act" between the "[p]rejudice to the People, prejudice to the victim's family waiting this long and having further . . . delay[s], against the Sixth Amendment right to counsel of choice." *See* CCA Op. at 40.

The California Court of Appeal reasonably concluded that the trial court's substitution of counsel denial was based on the lateness of the request, the delays that had already occurred, the substantial possibility that another continuance might be necessary, and the significant interests of the victim's family. As the state appellate court's determination was reasonable, and not contrary to clearly established Supreme Court precedent, it is entitled to deference under AEDPA. Accordingly, habeas relief is not warranted here and Alger's right to counsel claim is DENIED.

**CONCLUSION**

The California Court of Appeal's adjudication of Alger's claims did not result in decisions that were contrary to, or an unreasonable application of, clearly established federal law. Accordingly, the petition is DENIED.

A certificate of appealability will not issue as reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Alger may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

The clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated: June 20, 2018

William H. Orrick
United States District Judge